UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GENERAL ELECTRIC COMPANY, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 01-1549 (CCB) |
| DEPARTMENT OF THE AIR FORCE, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

In this case brought pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2000), plaintiff General Electric ("GE") seeks to prohibit defendant United States Department of the Air Force ("Department" or "Air Force") from disclosing unit pricing information contained in two contracts GE negotiated with the Air Force. Because the disclosure of unit pricing information is barred in this case by the Trade Secrets Act, 18 U.S.C. § 1905, the court will deny the Air Force's renewed motion for summary judgment and grant GE's renewed cross-motion for summary judgment.

**I. Factual Background**

The underlying facts in this "reverse FOIA" case were thoroughly set out in Judge Reggie Walton's March 31, 2004 memorandum opinion.[1] In brief, this dispute centers around

---

[1] I received this case from Judge Walton in June 2009 through inter-circuit assignment.

1

the disclosure of unit pricing information contained in two contracts between GE and the Air Force for spare parts for GE-manufactured jet engines. These contracts, F34601-99-D-2000 ("D-2000 contract") and F41608-00-D-0323 ("D-0323 contract"), are for the procurement of spare parts for GE's F101, F110, and F118 series jet engines and J85, TF34, and TF39 jet engines respectively. The first was entered into on February 12, 1999, and the second was entered into on September 12, 2000.

The Air Force received a FOIA request for the D-2000 contract and related documents in May 2000 from John J. Fausti and Associates, LLC, and it notified GE of this request via letter on May 22, 2000. After some initial communications between GE and the Air Force, GE expressed its opposition to the disclosure of the D-2000 contract's unit pricing information in a March 13, 2001 letter, stating that such disclosure would cause it substantial competitive harm, therefore bringing it within the scope of FOIA Exemption 4,[2] which exempts from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Nevertheless, the Air Force informed GE on July 16, 2001 that it intended to release the disputed information on July 30, 2001, basing its decision on its conclusion that the release of this information would not cause GE substantial competitive harm. This decision was a reversal of two prior decisions by the Air Force – one on October 7, 1999 and one on November 2, 1999 – not to disclose this information on the basis of FOIA Exemption 4.

The Air Force received a FOIA request for the D-0323 contract and related documents on

---

[2] For a discussion of why substantial competitive harm brings information within the scope of FOIA Exemption 4, see *infra* Section II.B.

September 18, 2000 from Sabreliner Corporation, and it notified GE of this request via letter on February 15, 2001. Again after some communications between GE and the Air Force, in which GE expressed its opposition on the ground that such disclosure would cause it substantial competitive harm, the Air Force informed GE on June 21, 2001 that it intended to release the disputed information on or after July 12, 2001 (fourteen working days later), stating that such information was not exempt under FOIA Exemption 4.[3]

In response, GE promptly filed suit in the District of Columbia on July 17, 2001, seeking to prevent the disclosure of unit pricing information in the D-2000 and D-0323 contracts. Cross-motions for summary judgment were submitted to the district court, and on March 31, 2004, Judge Walton issued a memorandum opinion in which he found that the Air Force had failed to justify adequately its decision to disclose the disputed information in the face of GE's objections. Specifically, he found that "the Air Force neglect[ed] to . . . address GE's argument that releasing the unit price information could cause its customers, such as foreign governments, to leverage GE's negotiated prices against it in future competitions" (March 31, 2004 Mem. Op. at 9-10 (internal footnotes omitted)), and suggested that this specter of customer competition "could qualify the pricing information at issue here as exempt under FOIA Exemption Four." (*Id.* at 10 (citing *McDonnell Douglas Corp. v. Nat'l Aeronautics & Space Admin.*, 180 F.3d 303, 307 (D.C. Cir. 1999) ("*NASA*")).) He also found that the Air Force's decision "was in direct contradiction to what it had previously decided regarding the same unit prices at issue," and that this departure from precedent was not sufficiently explained. (*Id.* at 17 (citing *Am. Fed'n of*

---

[3] The Air Force has agreed not to disclose the disputed information from either contract pending judicial resolution of this matter.

*Labor & Congress of Indus. Orgs. v. Brock*, 835 F.2d 912, 917 (D.C. Cir. 1987), for the proposition that such a departure requires proper justification).  The court therefore vacated the Air Force's decision and remanded the case to the Air Force, ordering it to issue a new decision within thirty days "regarding whether to disclose the unit pricing information at issue in accordance with the concerns raised in the Court's Memorandum Opinion." (March 31, 2004 Order.)

After receiving an extension of time, the Air Force issued its follow-up decision in a letter dated May 28, 2004 ("May Decision Letter").  In this letter, the Air Force explained that its previous decisions to withhold unit pricing information for the D-2000 contract were made pursuant to the D.C. Circuit's decision in *NASA*, which it understood as potentially creating a *per se* rule that unit pricing information must always be withheld.  It stated that its later decision to release the unit pricing information in both the D-2000 and D-0323 contracts was made after reading the D.C. Circuit's denial of rehearing en banc in that case, in which the court clarified that government disclosure of unit pricing information need not always be withheld.  This clarification of the law, it stated, explained its apparent departure from past agency precedent.

The Air Force also abided by the district court's request that it address GE's arguments about competitive harm.  The Air Force first asserted that GE faces no actual competition over these contracts because they are "sole source" contracts, i.e. contracts for which only GE can supply the parts needed.  The Air Force then asserted that, even if GE faced actual competition over these contracts, it had failed to demonstrate precisely how the disclosure of unit pricing information would cause it substantial competitive harm, but rather had offered only "conclusory allegations." (A.R. Tab 60, May Decision Ltr. at 5.)  It also argued that, as a general matter, a

customer's demand for prices comparable to those in the D-2000 and D-0323 contracts "is not by itself competitively harmful." (*Id.* at 7.)  Lastly, the Air Force contended that GE had no other customers who would order parts in quantities as large as those the Air Force orders, and so none of GE's other customers were in a position to demand price concessions based on the unit pricing GE offered to the Air Force. (*Id.* at 8.)

Because the Air Force found that GE had failed to demonstrate adequately substantial competitive harm, it concluded once again that the unit pricing information was not confidential and therefore not exempt from disclosure under FOIA Exemption 4. Accordingly, the Air Force ordered the disclosure of the disputed information. GE submitted two additional letters requesting that the Air Force reconsider this decision, but the Air Force was unpersuaded and reiterated its reasons for disclosure in a February 8, 2006 letter ("February Reconsideration Letter"). As an additional reason for disclosure, this letter also argued that the legislative history of FOIA and related regulations shows a congressional intent to put unit pricing information beyond the reach of Exemption 4.  Renewed cross-motions for summary judgment were subsequently filed.

## II. Analysis

**A. Standard of Review**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court has clarified

this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

In reverse FOIA cases like this one, the court's reviewing authority arises under Section 706 of the APA. *See Occidental Petroleum Corp. v. S.E.C.*, 873 F.2d 325, 337 (D.C. Cir. 1989) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 317-18 (1979)). Section 706 directs reviewing courts to set aside agency decisions that they find to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This "arbitrary and capricious" review is narrow in scope; "a court is not to substitute its judgment for that of the agency." *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 753 (D.C. Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Nevertheless, a court should not "defer to the agency's conclusory or unsupported suppositions." *McDonnell Douglas Corp. v. U.S. Dept. of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) ("*USAF II*") (citing *State Farm*, 463 U.S. at 43). Also, a court's review under Section 706 should be based on the full administrative record that was available to the agency at the time of its decision. *See Occidental Petroleum Corp.*, 873 F.2d at 338. Any *post hoc* rationales an agency provides for its decision are not to be considered. *See USAF II*, 375 F.3d at 1188.

Under review here is the Air Force's renewed decision to disclose unit pricing information from the D-2000 and D-0323 contracts, despite GE's objection on the ground that such pricing falls within the scope of FOIA Exemption 4. The court will base its analysis, then,

on the reasons put forward by the Air Force in its May Decision Letter and February Reconsideration Letter. Before examining the Air Force's reasons for disclosure, however, it is important to set forth the D.C. Circuit's test for determining what information falls within the scope of FOIA Exemption 4.

**B. Scope of FOIA Exemption 4**

As mentioned, FOIA Exemption 4 exempts from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). This exemption is co-extensive with the Trade Secrets Act, which prohibits federal government employees from disclosing confidential information. 18 U.S.C. § 1905; *see Canadian Commercial Corp. v. Dep't of Air Force*, 514 F.3d 37, 39 (D.C. Cir. 2008) (citing *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1151 (D.C. Cir. 1987)). "Accordingly, when a person can show that information falls within Exemption 4, then the government is precluded from releasing it under the Trade Secrets Act." *NASA*, 180 F.3d at 305 (citing *McDonnell Douglas Corp. v. Widnall*, 57 F.3d 1162, 1164 (D.C. Cir. 1995)); *see Canadian Commercial*, 514 F.3d at 39.

Where, as here, the parties agree that the information is "commercial or financial information obtained from a person" (where "person" includes corporations), the key inquiry is whether that information is "privileged or confidential." Frequently this inquiry focuses on whether the information is "confidential"[4]; indeed, both GE and the Air Force focus their

---

[4] "Privileged" information is generally understood to be information that falls within recognized constitutional, statutory, or common law privileges. *See Washington Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 267-268 & n.50 (D.C. Cir. 1982) (discussing

attention here. The D.C. Circuit has set out a multi-part test for determining whether information is "confidential." First, the court must determine whether the information was submitted to the government voluntarily. *See NASA*, 180 F.3d at 304. If it was, then the court must look to see whether the submitted information is "the kind of information 'that would customarily not be released to the public by the person from whom it was obtained.'" *Id.* (quoting *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc)). If it is, then the information is "confidential," and therefore precluded from disclosure by FOIA Exemption 4 and the Trade Secrets Act. *Critical Mass*, 975 F.2d at 880. If the submission of the information was compelled, however, then the court must determine whether its disclosure "would be likely either (1) to impair the government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *NASA*, 180 F.3d at 305 (citing *Critical Mass*, 975 F.2d at 878-80; *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974) ("*National Parks I*")). If the party seeking nondisclosure can show either impaired government ability to obtain necessary future information or substantial competitive harm, then the information is "confidential" and therefore precluded from disclosure by FOIA Exemption 4 and the Trade Secrets Act.[5] *National Parks I*, 498 F.2d at 770-71.

---

the meaning of "privileged" and noting that cases finding information "privileged" under FOIA Exemption 4 involved the attorney-client privilege); *see generally* 139 A.L.R. Fed. 225 § 14.

[5] As mentioned above, the Air Force originally disputed whether unit pricing information could come within the scope of Exemption 4 at all, regardless of whether it could be shown to be confidential in any of the ways mentioned. (A.R. Tab 63, February Reconsideration Letter at 1-4.) It is no longer advancing this argument, in light of the D.C. Circuit's ruling in *Canadian Commercial*. (Def.'s Mot. at 20.) *See Canadian Commercial*, 514 F.3d at 40 ("Contrary to the contention of the Air Force, it is the law of this circuit that line-item prices do come within

The parties dispute whether the submission of unit pricing information was voluntary or compelled in this case; GE claims that it was voluntary and the Air Force claims that it was compelled. I will assume without deciding that the information was not submitted voluntarily and move on to the question of whether the disclosure of the information would cause substantial competitive harm.[6] *See NASA*, 180 F.3d at 306-7 (regardless of whether information was voluntarily submitted, if it is confidential, then it is precluded from disclosure under FOIA Exemption 4 and the Trade Secrets Act); *cf. McDonnell Douglas Corp. v. NASA*, 895 F. Supp. 316, 318 (D. D.C.1995) ("[P]ricing information necessary for a government contract is considered involuntary for a FOIA exemption four analysis. . . . Price is an essential and required piece of information for the contract, no matter how it was achieved.").

**C. Air Force's Reasons for Finding Disclosure of the Disputed Information Unlikely to Cause Substantial Competitive Harm**

As already discussed, the Air Force's main reasons for disclosing the disputed information are as follows: (1) GE has failed to show that it faces actual competition over these particular contracts and so it has failed to show competitive harm from the disclosure[7]; (2) to the

---

Exemption 4.")

[6] The parties do not dispute that disclosure of the information would not impair the government's ability to obtain necessary information in the future. Accordingly, this prong of the inquiry need not be addressed.

[7] The Air Force writes:

[I]t is clear that GE does not actually face competition with respect to the items on the two contracts that are the subjects of the FOIA requests. Both contracts . . . were obtained on a sole source basis and each is restricted to items for which GE is the only source of supply. It necessarily follows that if a source of supply is the only source, it does not face competition.

extent that GE may face competitive harm, it has failed to articulate the nature of that competitive harm with precision[8]; (3) customer leverage is not by itself cognizable as competitive harm for purposes of FOIA Exemption 4[9]; and (4) even if customer leverage is cognizable, GE's customers are all sufficiently distinct from the Air Force that knowledge of GE's unit pricing in Air Force spare parts contracts would not give them leverage over GE in their own contracts.[10] All of these reasons lead the Air Force to conclude that no substantial competitive harm would result from the disclosure of the unit pricing information. Therefore, the information cannot be deemed "confidential" – and therefore not disclosable – under FOIA Exemption 4 and the Trade Secrets Act. Unfortunately for the Air Force, each of these reasons is either contrary to prevailing case law in this circuit or unsupported in light of the evidence in the administrative record.

---

(A.R. Tab 60, May Decision Ltr. at 4.)

[8] The Air Force writes that GE's letters and supporting affidavits fail to sufficiently explain how a competitor could use the disclosed unit pricing information to "determine the values assigned by GE to the many fluctuating variables such as raw material cost, labor cost, overhead, and acceptable profit that make up a unit price." (A.R. Tab 60, May Decision Ltr. at 7.)

[9] As the Air Force puts it, "That a customer would demand or seek prices for spare parts comparable to those in the contracts that are the subject of the FOIA requests in this case is not by itself competitively harmful." (A.R. Tab 60, May Decision Ltr. at 7.)

[10] Regarding this contention, the Air Force writes:

> GE has not shown that it has any other customer that would order parts in large quantities comparable to the anticipated Air Force orders. Consequently, it has not shown that any of its possible customers are in a position to be able to demand price concessions from GE based on the production efficiencies and savings from which GE would benefit.

(A.R. Tab 60, May Decision Ltr. at 8.)

Regarding the Air Force's actual competition argument, while it is true that GE needs to put forward evidence of actual competition, *see Gulf & Western Indus., Inc. v. United States*, 615 F.2d 527, 530 (D.C. Cir. 1979), such evidence need not be of actual competition over *these particular contracts*. *See National Parks I*, 498 F.2d at 770-71 (noting that, even though the concessioners faced no actual competition during the term of the contract with the government, disclosure of certain contract information might hurt their competitive position in a non-concession enterprise, making disclosure improper). Rather, GE need only put forward evidence that it has actual competition and that disclosure of the disputed information is likely to cause it substantial competitive harm in the future. *Gulf & Western*, 615 F.2d at 530 (citing *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673 (D.C. Cir. 1976) ("*National Parks II*")); *see USAF II*, 375 F.3d at 1189 (withholding information under FOIA Exemption 4 because its disclosure would "significantly increase the probability" [plaintiff's] competitors would underbid it in the event the Air Force rebids the contract"); *National Parks I*, 498 F.2d at 771 (tasking the district court with determining "whether public disclosure of the information in question poses the likelihood of substantial harm to the competitive positions of the parties from whom it has been obtained" in the future).

GE has adequately shown that it faces actual competition over jet engine spare parts. It competes directly with Sabreliner Corporation, the requester of the D-0323 contract's unit pricing information, for the provision of spare parts for J85 jet engines, parts which are covered by the D-0323 contract. (A.R. Tab 61, Supp. Metzger Aff. ¶ 4.) It also competes with Pratt &

Whitney, Inc. and other companies for the provision of jet engines more generally.[11] (*Id.* ¶ 3; *see id.* ¶ 7 (noting that Pratt & Whitney, Inc. manufactures "similar if not identical parts" to the ones GE produces for the jet engines covered by the D-2000 and D-0323 contracts).) While there was technically no competition for these two contracts – since GE was awarded them on a sole source basis – GE has demonstrated that there remains actual competition over both future contracts with the Air Force and contracts with other countries' air forces, such as those of South Korea and the United Arab Emirates. (*See* A.R. Tab 61, Supp. Metzger Aff. ¶¶ 3, 4 & 6.) *Cf. NASA*, 180 F.3d 303, 304 & 307 (withholding contract's pricing information under FOIA Exemption 4 on competitive harm grounds in case where no other contractors submitted proposals for the contract at issue). Thus, GE has adequately shown the likelihood of substantial competitive injury as well. Accordingly, the Air Force's actual competition argument fails.

Regarding the Air Force's imprecision argument, the case law is clear that GE is to be held to a lower standard than the one the Air Force suggests. While the burden is on GE to produce evidence indicating that release of pricing information would be competitively harmful, *see National Parks II*, 547 F.2d at 679, it need not demonstrate precisely how the release of the information would cause competitive harm. As the D.C. Circuit has stated, a party need not demonstrate how a competing firm would use the disclosed information to "model exactly or

---

[11] While the parties debate whether competition over jet engines may be considered here, and not simply competition over jet engine spare parts, the court agrees with GE that competition over jet engine spare parts is a subset of overall jet engine competition, and entities like the Air Force undoubtedly consider the likely cost of jet engine spare parts when considering which company to select for the provision of jet engines themselves. Accordingly, the court finds it appropriate to consider GE's actual competition in the realm of jet engine manufacturing in addition to its actual competition in the specific area of jet engine spare parts manufacturing.

pinpoint precisely [its] pricing strategy" in order to show a likelihood of substantial competitive harm; "pinpoint precision is not required to inflict substantial competitive harm." *USAF II*, 375 F.3d at 1193; *cf. McDonnell Douglas Corp. v. U.S. Dept. of Air Force*, 215 F. Supp. 2d 200, 205 (D. D.C. 2002) (*reversed in part by USAF II*) ("The harm from disclosure is a matter of speculation[.]"). GE has submitted extensive material explaining how its competitors could use the disputed information for competitive advantage (*see, e.g.*, GE Statement of Material Facts ¶¶ 38-39; A.R. Tab 61, Supp. Metzger Aff. ¶¶ 3-8) and the Air Force's response has been to assert that the material provided is insufficiently detailed. While there may be cases where a party fails to put forward sufficient evidence of the likelihood of substantial competitive harm, for instance cases where the party offers "mere conclusory opinion testimony," *National Parks II*, 547 F.2d at 679 (internal quotations omitted), this is not one. *Cf. USAF II*, 375 F.3d at 1192 (finding district court's decision to disclose certain contract information not arbitrary and capricious where the party seeking nondisclosure "present[ed] neither a viable theory nor any evidence to support its claim" that release of that information would cause it substantial competitive harm); *Boeing Co. v. U.S. Dep't of Air Force*, 616 F. Supp. 2d 40, 47-49 (D. D.C. 2009) (finding Boeing had presented insufficient evidence as to how years-old labor rates could be used to calculate future labor rates, and thereby cause it substantial competitive harm). Accordingly, the Air Force's imprecision argument in this instance is unsupported by the evidence in the administrative record and prevailing case law.

  Regarding customer leverage, contrary to the Air Force's assertion, this circuit has expressly found such leverage to have the potential to be substantially competitively harmful and therefore a basis for nondisclosure. In *NASA*, plaintiff McDonnell Douglas argued for

13

nondisclosure of certain line-item pricing information in part because its disclosure would "allow the company's commercial customers to negotiate more effectively and thereby 'ratchet down' McDonnell Douglas' prices." 180 F.3d at 305. The agency found this competitive harm rationale unconvincing, but in its review, the D.C. Circuit found it "indisputable." *Id.* at 307; *see also National Parks II*, 547 F.2d at 684 (ruling that disclosure of certain information would increase the likelihood of substantial competitive harm in part because "[s]uppliers, contractors, labor unions and creditors, too, could use such information to bargain for higher prices, wages or interest rates"). Accordingly, the court finds the Air Force's rejection of the customer leverage argument here to be unsupported by the prevailing case law.

      Finally, the court finds the Air Force's contention that GE's other customers do not enjoy comparable bargaining positions to be both irrelevant and unsupported by the administrative record. Nowhere in the regulations or case law is it suggested that, in order to show a likelihood of substantial competitive harm from customers, a party needs to demonstrate that its customers are in a wholly comparable bargaining position to the government agency involved in the dispute. Moreover, many of GE's customers, despite not being the size of the U.S. Air Force, are still in a position to buy jet engine spare parts in vast quantities. (*See* A.R. Tab 61, Supp. Metzger Aff. ¶¶ 4 & 6 (discussing GE's competition for jet engine spare parts contracts with the Brazilian Air Force, the Korean Air Force, the Turkish Air Force, and the air forces of Israel and the United Arab Emirates.) Thus, while it is unlikely that these customers – upon learning the unit pricing to which GE agreed in the D-2000 and D-0323 contracts – would be able to demand the *same* unit pricing in their own contracts with GE, it is likely that they nonetheless would be able to demand lower unit pricing in an array of contracts covering a large body of jet engine

14

equipment. The administrative record therefore shows that disclosure of unit pricing information would likely pose substantial competitive harm to GE from its customers; that showing is sufficient to deem the information "confidential" for purposes of FOIA Exemption 4 and the Trade Secrets Act.[12]

---

[12] For the reasons discussed above, the applicable statutes and precedent require a finding that the pricing information at issue here should not be disclosed, given the likelihood of substantial competitive harm that would result. *See Canadian Commercial*, 514 F.3d at 40 ("line-item pricing information in a Government contract falls within Exemption 4 of the FOIA if its disclosure would . . . 'cause substantial harm to the competitive position of the person from whom the information was obtained.'") (quoting *National Parks I*, 498 F.2d at 770); *NASA*, 180 F.3d at 307 ("McDonnell Douglas has shown . . . that it is likely to suffer substantial competitive harm. And under present law, whatever may be the desirable policy course, appellant has every right to insist that its line item prices be withheld as confidential.") Nevertheless, the court shares the view expressed by some in the D.C. Circuit that such nondisclosure is not the optimal policy course. As Judge Tatel writes in his concurrence in *Canadian Commercial*, "given that FOIA's primary purpose is to inform citizens about what their government is up to, it seems quite unlikely that Congress intended to prevent the public from learning how much the government pays for goods and services." 514 F.3d at 43 (internal quotations and citation omitted); *see USAF II*, 375 F.3d at 1203 (Garland, J., concurring in part and dissenting in part) (noting that application of the substantial competitive harm test "may bar disclosure of [line-item] prices in the very situation in which the public interest in disclosure is at its apogee"); *Widnall*, 57 F.3d at 1167 ("the idea that a price charged to the government for specific goods or services could be a 'trade secret' appears passing strange to us"). A change in policy course, however, is not up to this court to effectuate, as "the question [is] settled in this circuit." *Canadian Commercial*, 514 F.3d at 44 (Tatel, J., concurring); *see Widnall*, 57 F.3d at 1167.

15

### III. Conclusion

Because the Air Force's reasons for rejecting GE's competitive harm arguments are either contrary to prevailing case law in this circuit or unsupported in light of the evidence in the administrative record, its resulting disclosure decision is arbitrary, capricious, and not in accordance with the law. *See NASA*, 180 F.3d at 307 (finding agency's decision to be "arbitrary and capricious for its illogical application of the competitive harm test").[13] Accordingly, the Air Force's motion for summary judgment shall be denied and GE's cross-motion for summary judgment shall be granted.

A separate Order follows.

    August 28, 2009                             /s/
Date                                                Catherine C. Blake
                                                         United States District Judge

---

[13] Because I am finding against the Air Force on this ground, I need not reach the question, raised in the court's previous memorandum opinion, whether the Air Force's reasoning adequately justifies its departure from its prior decisions. *See generally Seminole Nation of Oklahoma v. Norton*, 223 F. Supp. 2d 122, 143 (D. D.C. 2002) ("An agency's departure from its prior decisions can be considered to be arbitrary, capricious and an abuse of discretion, especially where the agency has failed to explain its departure from prior precedent.") (internal quotations and citations omitted); *Brock*, 835 F.2d at 917 ("Whatever the [agency's] ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate") (quoting *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) (emphasis omitted).